NOT RECOMMENDED FOR FULL-TEXT PUBLICATION
File Name: 16a0419n.06

No. 15-4303

FILED
Jul 27, 2016
DEBORAH S. HUNT, Clerk

**UNITED STATES COURT OF APPEALS
FOR THE SIXTH CIRCUIT**

| | | |
|---|---|---|
| VIRGINIA WHITMAN; BRUCE WHITMAN; ANDREW WHITMAN; JACOB WHITMAN, | ) ) ) | |
| Plaintiffs-Appellants, | ) ) | |
| v. | ) ) ) | ON APPEAL FROM THE UNITED STATES DISTRICT COURT FOR THE SOUTHERN |
| FOREMOST INSURANCE COMPANY, | ) ) | DISTRICT OF OHIO |
| Defendant-Appellee. | ) ) | |

BEFORE:     SUHRHEINRICH, ROGERS, and GRIFFIN, Circuit Judges.

SUHRHEINRICH, Circuit Judge.

Plaintiffs-Appellants, Virginia Whitman, her husband, and her two sons (collectively, "the Whitmans"), filed this declaratory judgment action seeking a declaration that an insurance policy issued by Defendant-Appellee, Foremost Insurance Company ("Foremost"), covered the owners of the Cincinnati property where Virginia Whitman was injured in a dog attack. The district court granted summary judgment to Foremost, holding that the plain terms of the insurance agreement did not provide coverage. We **AFFIRM**.

## I.     BACKGROUND

Virginia Whitman was injured in a dog attack that occurred on September 22, 2012 at 4870 Winton Road, Cincinnati, Ohio ("Winton Road property"). At the time of the attack, the

Winton Road property was owned and occupied by Charles and Kimberly Toran, subject to a mortgage held by the Gerson Company, an Ohio LLC. Also at that time, the premises were insured under a policy issued by Foremost to the Gerson Company.

In the years preceding and following the dog attack, ownership of the Winton Road property shifted several times between the Gerson Company and the Toran family. These transactions grew out of the Torans' relationship with Michael Gerson ("Gerson"), who is one of two members in the Gerson Company. Gerson first met Charles Toran through Charles' mother, who cared for Gerson's parents at the end of their lives. Charles and his wife, Kimberly, later worked as property managers for Kings Court—another LLC in which Gerson was a member. Gerson, however, sold his interest in Kings Court in 2007, and the Torans ceased their employment as property managers sometime before 2012. Charles and Kimberly Toran were also the Gerson Company's first tenants at the Winton Road property.

The Gerson Company attempted to transfer the Winton Road property to Charles and Kimberly Toran in October 2003 under a land installment contract. The Torans, however, never made any payments under the land sale contract, and the title to the property remained with the Gerson Company. In August 2008, the Gerson Company sold the Winton Road property to Charles and Kimberly Toran for $120,000, this time by general warranty deed. The Torans, in turn, executed a promissory note and a mortgage to the Gerson Company for $120,000. The Torans made only about a year's worth of mortgage payments. Despite the Torans' chronic default, Gerson never took action to foreclose on the property. He did, however, deliver letters and make phone calls to the Torans asking for payment. Gerson denied that he and the Torans formed any agreement to waive mortgage payments.

In addition to defaulting on their mortgage payments, the Torans also failed to pay property taxes. As a result, a tax lien was issued. Woods Cove, LLC purchased the lien and sent notice of its intent to foreclose sometime in late September or early October of 2012. At that time, the Torans agreed to transfer the Winton Road property back to the Gerson Company by a deed in lieu of foreclosure dated October 11, 2012. Gerson reacquired title to the property on behalf of the Gerson Company and paid the tax lien.

Therefore, at the time of the dog attack on September 22, 2012, the Torans still held title to the Winton Road property. Also at that time, the premises were insured under a "Dwelling Fire Three Policy Landlord" issued by Foremost to the Gerson Company. The policy included liability coverage for claims brought against the insured "for damages because of bodily injury . . . caused by an accident on your premises to which this coverage applies." The named insured on the policy's Declarations Page was "the Gerson Companies." The policy specified that it covered the named insured and "any employees of the person, persons or organization named on the Declarations Page for acts that occur on the premises and are within the course of their employment." The policy did not define "employee." It did, however, define "residence employee" as "an employee of yours who performs duties in connection with the maintenance or use of your premises, including household or domestic services."

Charles Toran and his son, Marcus, testified that, during the time frame when Charles and Kimberly Toran held title to the Winton Road property, they controlled the property, Gerson never told them how to use the property, and Gerson was not involved in the ownership or care of the dogs that lived on the property. While occupying the house as titleholders, the Torans mowed the lawn, arranged for plumbing repairs, and painted the house when needed.

The Whitmans filed a lawsuit against the Torans in Ohio state court for the injuries caused by the dog attack. They ultimately obtained a default judgment of $696,954.98. When Foremost declined to satisfy the Whitmans' judgment against the Torans, the Whitmans brought this declaratory judgment action against Foremost. Foremost moved for summary judgment on the grounds that the Torans were not insureds or covered employees under the Gerson Company's insurance policy. The Whitmans responded that the insurance policy covered the Torans because the Torans were "residence employees" by virtue of the acts they performed in connection with the premises, including mowing the lawn, arranging for repairs, and painting. The district court granted summary judgment to Foremost, finding that the term "employee" was not ambiguous under the Ohio Supreme Court's decision in *Nationwide Mutual Fire Insurance Co. v. Guman Bros. Farm*, 652 N.E.2d 684 (Ohio 1995), and that the Torans were indisputably not employees of the Gerson Company. The Whitmans now appeal.

The district court had jurisdiction under 28 U.S.C. § 1332(a) because the parties have diverse citizenship—the Whitmans are Ohio citizens,[1] and Foremost is a Michigan citizen[2]—and the amount in controversy exceeds $75,000. We have jurisdiction under 28 U.S.C. § 1291.

## II.    STANDARD OF REVIEW

We review the district court's grant of summary judgment de novo. *Burniac v. Wells Fargo*, 810 F.3d 429, 432 (6th Cir. 2016). Summary judgment is proper where the "the movant shows that there is no genuine dispute as to any material fact and the movant is entitled to

---

[1] Jacob Whitman is a citizen of Pennsylvania.

[2] The "direct action" exception to determining insurer citizenship under 28 U.S.C. § 1332(c)(1) does not apply because the Whitmans first obtained a judgment against the purportedly insured party, the Torans, before suing the liability insurer. This lawsuit is therefore not a "direct action." *See Peterson v. TIG Specialty Ins. Co.*, 211 F. Supp. 2d 1013, 1015 (S.D. Ohio 2002) (defining a "direct action" under § 1332(c)(1) as one "in which a party suffering injuries or damage for which another is legally responsible is entitled to bring suit against the other's liability insurance without joining the insured or first obtaining a judgment against him." (quoting *Vargas v. Cal. State Auto. Ass'n Inter-Ins. Bureau*, 788 F. Supp. 462, 463 (D. Nev. 1992)).

judgment as a matter of law." Fed. R. Civ. P. 56(a). The court must determine "whether there is the need for a trial—whether, in other words, there are any genuine factual issues that properly can be resolved only by a finder of fact because they may reasonably be resolved in favor of either party." *Anderson v. Liberty Lobby, Inc.*, 477 U.S. 242, 250 (1986). If the facts in a case are undisputed, one of the parties is entitled to judgment as a matter of law. *Coles ex rel. Coles v. Cleveland Bd. of Educ.*, 171 F.3d 369, 376 (6th Cir. 1999). Here, the parties do not offer opposing factual stories but, rather, dispute whether the agreed-upon facts justify a legal conclusion that the Torans acted as the Gerson Company's employees.

## III.    ANALYSIS

The parties agree that Ohio law governs this dispute. When the language of a written contract is clear and unambiguous, Ohio law dictates that the court "look no further than the writing itself to find the intent of the parties." *Westfield Ins. Co. v. Galatis*, 797 N.E.2d 1256, 1261 (Ohio 2003); *see also Toledo-Lucas Cty. Port Auth. v. Axa Marine & Aviation Ins., Ltd.*, 368 F.3d 524, 530 (6th Cir. 2004) ("When the 'terms of an insurance policy are clear and unambiguous,' Ohio law requires a court to 'appl[y] [them] to the facts without engaging in any construction.'" (quoting *Ledyard v. Auto-Owners Mut. Ins. Co.*, 739 N.E.2d 1, 3 (Ohio 2000))). Under Ohio law, a contract is unambiguous as a matter of law if it can be given definite legal meaning. *Westfield*, 797 N.E.2d at 1261. "The mere absence of a definition in an insurance contract does not make the meaning of the term ambiguous." *Guman*, 652 N.E.2d at 686. Rather, a court must lend undefined terms their plain and ordinary meaning. *Id.*

The only issue before both the district court and this court is whether the Torans were employees of the Gerson Company at the time of the dog attack. If not, there is no genuine issue for trial because the Foremost insurance policy covers only the liabilities of the Gerson Company

and, in some situations, its employees. The Whitmans attempt to sidestep this threshold issue by looking solely at the insurance policy's defined term "residence employee" (i.e. "an employee of yours who performs duties in connection with the maintenance or use of your premises") and focusing on the Torans' activities that contributed to the "maintenance" and "use" of the Winton Road property. The problem with this approach is that the definition of "residence employee" itself incorporates the term "employee." The Whitmans overlook this prerequisite language and, in doing so, place undue significance on the Torans' maintenance and use of the property. But the Torans cannot be "residence employees" merely by virtue of maintaining and using the Winton Road property without first meeting the plain and ordinary definition of "employee."

Although the Foremost policy does not define the term "employee," the Ohio Supreme Court unanimously held in *Guman* that the term "employee" in an insurance policy is not ambiguous but, rather, conveys a plain and ordinary meaning. 652 N.E.2d at 686. The Ohio Supreme Court turned to Black's Law Dictionary for the plain and ordinary meaning of "employee" and adopted the following definition:

> [A] person in the service of another . . . where the employer has the power or right to control and direct the employee in the material details of how the work is to be performed. . . . One who works for an employer; a person working for salary or wages.

*Id.* at 686-87. In *Guman*, the court concluded that a high school student working on a farm for $3/hour satisfied this definition, even though his work on the farm also qualified for school credit, because the farm controlled the jobs he performed and directed his work, whereas the school's supervision was minimal. *Id.* at 687. Ohio courts continue to apply *Guman*'s plain and ordinary meaning of "employee" to insurance contract disputes. *See Am. Motorists Ins. Co. v. Unger*, No. 4-02-30, 2003 WL 1873258, at *4-5 (Ohio Ct. App. 2003) (holding that a former employee on lay-off status was not an "employee" under the employer's insurance contract

because he was no longer paid wages, was not required to report to work, and was free to seek other employment); *W. World Ins. Co. v. Spevco, Inc.*, 671 N.E.2d 1100, 1102-03 (Ohio Ct. App. 1996) (holding that a contractor was an "employee" under an insurance contract because the insured party, rather than the contractor, controlled and directed the contractor in the material details of the work).

No facts in the record suggest that the Torans fall into the Ohio courts' accepted definition of "employee" for insurance contracts. The Whitmans cannot identify any facts that demonstrate: (1) the Gerson Company's right to control the Torans in their use and maintenance of the property, and (2) compensation to the Torans in exchange for their maintenance activities. *See Guman*, 652 N.E.2d at 686-87. As the district court noted, "[i]t is not disputed that at the time of [the dog attack], none of the Torans was formally employed by [t]he Gerson Company, Michael Gerson, or any other of Gerson's businesses." While the Torans were at one time employed as property managers by one of Gerson's businesses, Gerson's interest in that business ended in 2007—long before the dog attack in 2012. Nor is there any indication that after the conclusion of their formal employment relationship, Gerson (or the Gerson Company) and the Torans developed an "informal" employment relationship that meets the definition set forth in *Guman*. There is no evidence that the Gerson Company controlled or instructed the Torans in their use of the Winton Road property. On the contrary, Charles Toran testified that Gerson never exerted any control over their use of the premises: "My wife and I controlled the property. Mr. Gerson didn't have any right to tell us how we could use the property or take care of my dog, and Mr. Gerson never told us how we could use the property." The Whitmans have not presented any evidence that, following the transfer of title in 2008, Gerson contacted the Torans

for any reason other than to inquire about the mortgage payments and, later, the impending tax foreclosure.

The Whitmans also have not pointed to any evidence that the Gerson Company paid the Torans a salary, wages, or any other form of remuneration in exchange for their occupancy and maintenance of the Winton Road property.[3] There is also no indication that the Gerson Company agreed to waive the Torans' mortgage payments or delay foreclosure in exchange for the Torans' habitation and maintenance of the property. The mere fact that the Torans defaulted on their mortgage payments yet continued to live on and maintain the property does not imply an employment relationship with their mortgagee. As the district court correctly noted, prior to foreclosure the Torans "retained all ownership rights in the Winton Road property and any upkeep and maintenance they did on the premises can only reasonably be considered to have been done for their own benefit." *See generally Hausman v. Dayton*, 653 N.E.2d 1190, 1194 (Ohio 1995) ("[U]ntil a mortgage is foreclosed and a sale consummated, or until a mortgagee obtains possession by ejectment proceedings, the fee to mortgaged real estate . . . remains in the mortgagor." (internal quotation marks omitted)); *Levin v. Carney*, 120 N.E.2d 92, 97 (Ohio 1954) (holding that the "real and beneficial use" of the property belongs to the mortgagor until foreclosure and sale).

## IV. CONCLUSION

Because the Whitmans raise no genuine issue of material fact that the Torans were employees of the Gerson Company, Foremost has no obligation to satisfy the Whitmans' default judgment against the Torans. We therefore **AFFIRM** the district court's grant of summary judgment to Foremost.

---

[3] Thus, we have no need to address the possibility that an independent contractor hired to provide a maintenance service might be an employee under the insurance contract.